UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KARLA BROERSMA,

      Plaintiff,

v.

                                        Case No. 1:22-cv-327

                                        Hon. Ray Kent

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant,

_____/

**OPINION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) which denied her application for disability insurance benefits (DIB).

On December 19, 2019, plaintiff filed an application for DIB alleging a disability onset date of March 1, 2019, which was later amended to July 1, 2019. PageID.33, 36. Plaintiff identified her disabling conditions as migraines, vertigo, chronic pain in left ankle, chronic low back pain, and arthritis. PageID.243. Prior to applying for DIB, plaintiff completed the 12th grade and had past relevant work as a medical assistant. PageID.54, 244. An administrative law judge (ALJ) reviewed plaintiff's application de novo and entered a written decision denying benefits on November 24, 2020. PageID.33-55. This decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

## I.    LEGAL STANDARD

"The federal courts review the Commissioner's factual findings for substantial evidence and give fresh review to its legal interpretations."  *Taskila v. Commissioner of Social Security*, 819 F.3d 902, 903 (6th Cir. 2016).  This Court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence.  42 U.S.C. § 405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990).  "[T]he threshold for such evidentiary sufficiency is not high."  *Biestek v. Berryhill*, -- U.S. --, 139 S. Ct. 1148, 1154 (2019).  "Substantial evidence, this Court has said, is more than a mere scintilla.  It means — and means only — such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id*. (internal quotation marks and citations omitted).

A determination of substantiality of the evidence must be based upon the record taken as a whole.  *Young v. Secretary of Health and Human Services*, 925 F.2d 146 (6th Cir. 1990).  The scope of this review is limited to an examination of the record only.  This Court does not review the evidence de novo, make credibility determinations, or weigh the evidence.  *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).  The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record.  *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988).  "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994).

A claimant must prove that he suffers from a disability in order to be entitled to benefits.  A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  *See* 20 C.F.R. §404.1505; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . .  physical or mental ability to do basic work activities."  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (citations omitted).

The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four.  *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003).  However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile."  *Id.*  If it is determined that a claimant is or is not disabled at any point in the evaluation process, further review is not necessary.  *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

## II.     ALJ's DECISION

Plaintiff's application for DIB failed at the fifth step of the evaluation.  At the first step, the ALJ found that plaintiff has not engaged in substantial gainful employment since the amended onset date of July 1, 2019, and meets the insured status requirements of the Social Security Act through December 31, 2024.  PageID.36.  At the second step, the ALJ found that plaintiff had severe impairments of:  degenerative joint disease of the left lower extremity status-post left lower extremity fractures and total ankle arthrotomy; bilateral patellofemoral arthritis; thoracic and lumbar degenerative disc disease; mild cervical degenerative disc disease; migraines; and vertigo.  *Id*.  At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  PageID.40.

The ALJ decided at the fourth step that:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: occasional climbing of ramps and stairs; never climbing ladders, ropes, and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; limited to frequent to exposure to extreme cold, extreme heat, vibration, and pulmonary irritants; further would be limited to concentrated exposure to noise; limited to no exposure to hazardous moving machinery and unprotected heights; and will require the opportunity to alternate between sitting and standing as frequently as every 30 minutes.

PageID.41.  The ALJ also found that plaintiff is unable to perform any past relevant work.  PageID.53.

At the fifth step, the ALJ found that plaintiff could perform a significant number of unskilled jobs at the light exertional level.  PageID.54-55.  Specifically, the ALJ found that plaintiff could perform the requirements of occupations in the national economy such as an assembler (330,000 jobs), a packer (280,000 jobs), and an inspector (190,000 jobs).  *Id*.  Accordingly, the

ALJ determined that plaintiff has not been under a disability, as defined in the Social Security Act, from July 1, 2019 (the amended disability onset date) through November 24, 2020 (the date of the decision).  PageID.55.

### III.    DISCUSSION

Plaintiff raises two issues on appeal.

**A.     The decision violates the rules on failing to seek medical treatment without considering the ability to afford treatment.**

Plaintiff contends that her primary impairment involves her left ankle and the pain associated with her previous injury.  At the hearing the ALJ recognized that plaintiff has serious problems with her ankle noting that her impairments included:

> Degenerative joint disease, the left lower extremity we are status-post total ankle arthrotomy – arthrotomy, I'm sorry.  We have degenerative disc disease, depression, anxiety.  We're also, I could say, status-post left lower extremity fractures.  There's a lot of trauma down there.

PageID.70.  The ALJ's decision also recognized plaintiff's history of ankle problems:

> The record demonstrates that in 1990, the claimant sustained multiple left lower extremity fractures in a motor vehicle accident, with multiple left lower extremity surgeries including total left ankle replacement in 2016 (*See, e.g.*, Ex. 2F/35; 9F/4, 9, 128, 146, 159-160; and 13F/8). In August 2018, prior to the cessation of substantial gainful activity, she underwent a left ankle arthrotomy with loose body excision (Ex. 2F/20).

PageID.43.

The gist of plaintiff's argument is that a remand is required because,

> The Unfavorable Decision repeatedly criticizes [plaintiff] for not seeking medical treatment. But she testified that, due to the Covid epidemic, she had lost her health insurance coverage and had trouble accessing care. The Decision violates the SSA rule requiring consideration of the inability to afford treatment.

Plaintiff's Brief (ECF No. 10, PageID.1212).

Plaintiff refers to the evaluation process set out in SSR 16-3p, which sets out the two-step process for evaluating an individual's symptoms: (1) "We determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms;" and, (2) "We evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities."  SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).  *See* 20 C.F.R. § 404.1529(c)(1) and (2).  The Commissioner also considers other evidence including:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

In evaluating symptoms, SSR 16-3p points out that,

> We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult . . ... Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

> In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.  We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with

treatment or seek treatment consistent with the degree of his or her complaints.  We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.  <u>When we consider the individual's treatment history, we may consider (but are not limited to) one or more of the following</u>: . . . .

> <u>An individual may not be able to afford treatment and may not have access to free or low-cost medical services.</u>

SSR 16-3p, 2017 WL 5180304 at *9-10 (Oct. 25, 2017) (omitted) (emphasis added).  In summary, "before drawing a negative inference from an individual's failure to 'seek or pursue regular medical treatment,' the ALJ must consider 'any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment'"[,] *e.g.*, "[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services."  *Dooley v. Commissioner of Social Security*, 656 Fed. Appx. 113, 119 (6th Cir. 2016).[1]

Here, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p."  PageID.42.  In this regard, the ALJ observed that:

---

[1] While the Court decided *Dooley* under superseded SSR 96-7p, it acknowledged that the relevant considerations also appear in SSR 16-3p:

> After the ALJ's January 2014 decision was issued, the Commissioner issued a new ruling, SSR 16-3p, which supersedes SSR 96-7p. 2016 WL 1119029 (Mar. 16, 2016). SSR 96-7p "eliminat[es] the use of the term 'credibility' from [the Commissioner's] sub-regulatory policy" in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." *Id*. at *1. However, SSR 16–3p does not alter the rule that the ALJ should consider "possible reasons" why a claimant failed to seek medical treatment "consistent with the degree of his or her complaints" before drawing an adverse inference from the claimant's lack of medical treatment. *Id*. at *8. Accordingly, we need not reach the issue of whether this ruling applies retroactively.

*Dooley*, 656 Fed. Appx at 119, fn 1.

[Plaintiff] noted she does not have insurance coverage currently, indicating she plans to have some additional testing once her husband has insurance at the beginning of 2021.

PageID.43.

In plaintiff's brief, she identified portions of the ALJ's decision which discount her symptoms and treater's opinions due to infrequent medical treatment:

> The Decision analyzes Ms. Broersma's impairments beginning with the main problem, her left ankle. (PageID.43-46). In regard to her ankle, it notes "multiple surgeries on her lower left extremity, with the most recent surgery performed in 2018." (PageID.45).  But it finds, "However, the claimant's recent treatment has been relatively conservative." (PageID.45). "The record does not document frequent urgent or emergent evaluation of symptoms." (PageID.45).

> The Decision fails to discuss, however, the fact that her access to insurance limits her access to treatment. When discussing her alleged symptoms, the Decision closes with a note that she lacks current insurance. (PageID.43). But it does not consider the lack of insurance when criticizing the treatment she has sought.

> When weighing medical source statements, the Decision repeats this error. It downplays the opinion of Wendy Balivet, M.D., from her primary care office, because Dr. Balivet had not seen her since June 2019. (PageID.52). It dismisses the opinion of nurse practitioner, Aaron Emmons, from her neurology office because, "Mr. Emmons had not examined the claimant recently at the time these restrictions were provided, such that he last examined her in April 2020." (PageID.52). Neither in regard to Dr. Balivet nor Mr. Emmons did the Decision consider Ms. Broersma's ability to afford additional treatment.

Plaintiff's Brief at PageID.1213.[2]

At the administrative hearing held on November 4, 2020, plaintiff explained that she had limited access to health care during COVID pandemic.  Plaintiff testified that she lived

---

[2] The ALJ found Dr. Balivet's opinions regarding plaintiff's limitations as "less persuasive" due to recent visits:

> However, the record suggests that although Dr. Balivet has been involved in the claimant's care, she has not examined the claimant since June 2019, which was prior to the cessation of substantial gainful activity (Ex. 9F/178; *See, generally*, Ex. 1F-13F). The lack of recent examination by Dr. Balivet suggests the assessed limitations are based primarily on the claimant's subjective complaints rather than objective medical evidence (Ex. 9F/178). . .

PageID.51-52.

with her spouse, that "[h]e was let go due to COVID cutbacks in May of this year [2020]", and

that "he is currently looking for work and is working, expecting income soon." PageID.73. When

plaintiff's counsel asked how often she saw primary care doctors, plaintiff responded

> I probably touch base with them once a month, and if I need to be seen, probably once every other month. I currently do not have insurance, like I stated, and so they're – we're going back and forth quite a bit with just a phone call.

PageID.78-79. In this regard, plaintiff explained that one of the physicians providing an opinion,

Dr. Balivet, was not her primary medical provider:

> Q     Ms . Broersma, who is your primary care doctor currently?
>
> A     My currently [sic] primary is Dr. Channing Finkbeiner.
>
> Q     Okay.
>
> A     My care has been moved over to Dr. Wendy Balivet because he is actually on a ventilator with COVID.

PageID.78.

> As to other health care providers, the plaintiff testified as follows:
>
> Q     Okay. All right. And are you seeing any other providers currently?
>
> A     Currently, besides the ones that you have, I am not.
>
> Q     Okay.  Are you seeing anyone for your ankle currently?
>
> A     I do. I see OAM, Orthopaedics Associates of Michigan.
>
> Q     When was your last appointment?
>
> A     Oh, boy.
>
> Q     You know, ball park.  I'm not asking for an exact date.  I'm just trying to get a --
>
> A     Probably five -- yeah, for the ankle, probably five months ago.  I've been in there for my knee injections probably within the last --  about a year ago.

PageID.79.

Counsel developed additional testimony from plaintiff regarding her lack of insurance:

Q      You mentioned that you don't have insurance now.  Would you be getting more treatment if you had insurance?

A      Yes. My goal is -- my husband is working and should be qualifying for insurance the beginning of the year. And then I'm supposed to be getting hip x-rays to look at the -- how that – if it's a hip or – we're not sure what's going on.  It was originally, they thought it was probably nerve pain from the sciatica.

Q      All right.

A      So I got to pursue that more.

Q      All right.

A      The x - ray is on order, so.

Q      We ordered x-rays – I'm sorry.  We ordered records from the Spectrum Neuroscience office because that's where you get the Toradol and the Ajovy, is that right?

A      That is correct.

Q      Now, they -- the response we got was that there were no records. What kind of treatment are you getting from that office?

A      For the Neuroscience, they actually sent a letter over today.  My husband lost his insurance in May, and they currently are giving me the Ajovy, which is a three month every three months you give yourself an injection.  That is to prevent the migraines.  And then they give me the Toradol on hand, and the Imitrex.

Q      So are they giving you those medications for free?

A      They are giving me the Ajovy for free, because it's usually $2,000.  And they've been very kind to actually provide that to me.  I went in and the nurse met me at the door because of the COVID, and then they give the samples to me at this time.

Q      So you haven't been in for, like, an office visit to see the folks for a while?

A      That is correct.  Since May they're working via, really, telephone.  And they gave me a nice amount of Toradol to use cautiously to keep me out of the ER with a migraine.

10

Q        Did you at one time, though -- you did go in and get evaluated at that office?

A        Oh, yes.

PageID.87-88.

Plaintiff's testimony established that since May 2020, some of her medical treatment was delayed due to her lack of insurance, and some medical providers provided her with free medication to avoid a medical emergency.  As discussed, the ALJ considered plaintiff's lack of treatment in discounting the severity of her symptoms and limitations, as well as discounting the opinions of Dr. Balivet and NP Emmons as less persuasive.  While the ALJ noted plaintiff's lack of insurance, he did not address plaintiff's ability to afford medical treatment since May 2020 as required by SSR 16-3p.  *See, e.g., Dooley*, 656 Fed. Appx. at 119.

Based on this record, the Court concludes that the ALJ drew a negative inference from plaintiff's failure to seek out medical treatment without adequately considering her inability to afford such treatment since her husband lost medical insurance in May 2020.  Accordingly, this matter will be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the Commissioner will be directed to re-evaluate plaintiff's symptoms taking into account her inability to afford medical treatment during the time in which her husband lost the family's medical insurance.

### B.    The decision lacks substantial evidence to discount plaintiff's pain symptoms when its own recitation of the objective medical evidence fully supports the symptoms.

Plaintiff contends that the ALJ failed to consider the full extent of her pain.  As discussed, SSR 16-3p sets out the two-step process for evaluating an individual's symptoms.  *See* 20 C.F.R. § 404.1529(c)(1), (2), and (3).  Here, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that

11

plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.  PageID.43.

It is difficult to follow the chronology of plaintiff's medical condition as set forth in the ALJ's decision.  As discussed, plaintiff alleged a disability onset date of March 1, 2019, which was later amended to July 1, 2019. PageID.33, 36.  The Court notes that a significant portion of plaintiff's medical records evaluated by the ALJ pre-date the amended onset date.  *See* PageID.42-53.  Some of the medical records suggest that plaintiff's condition deteriorated as it approached her disability onset date.  For example,

> In May and June 2019, she presented with bilateral patellar crepitus and small joint effusion (Ex. 2F/14-19 and 9F/129-130). She was diagnosed with bilateral patellofemoral arthritis (Ex. 9F/130). During evaluations from December 2019 through September 2020, she sometimes had reduced lumbar spine range of motion (Ex. 8F/8, 49, 72; and 13F/8, 14). In August and September 2020, she had decreased strength in right toe extension; however, it was also reported her strength was strong and equal (Ex. 13F/9-16). In August 2020, she had an absent Achilles' reflex on the left due to a prior fusion, as well as positive facet loading (Ex. 13F/9-10).

*Id*.

Similarly, the ALJ found that,

> At times, the claimant reported tenderness to palpation of the cervical spine and/or muscles, with tenderness of the right upper trapezius muscle noted in June 2019 (Ex. 5F/5; 6F/30-31; 8F/37, 59; and 9F/181, 295). She sometimes had reduced cervical spine range of motion (Ex. 5F/4-5, 52-57; 6F/30-31; 7F/24; 8F/59; and 9F/295). In March 2019, during emergent evaluation of a headache, she appeared uncomfortable and had a blanket pulled over her face (Ex. 9F/140). In April and May 2019, during physical therapy evaluations, the claimant moved cautiously (Ex. 5F/4-5 and 6F/30-31). In May 2019, a Dix-Hallpike test was positive for nystagmus on the left (Ex. 5F/5). In October 2019, the claimant's neck muscles were positive for spasms and/or tenderness (Ex. 7F/24). In December 2019, she moved cautiously, with dizziness reported upon administration of the Dix-Hallpike test on the left (Ex. 5F/52-57; *See also* Ex. 8F/10). She had increased spasms and/or tenderness upon examination of the neck (Ex. 9F/16). In January 2020, she had cervical paraspinal tension and limited cervical mobility (Ex. 8F/31 and 37). She subsequently had increased spasm or tenderness of the neck muscles (Ex. 6F/7).

PageID.46-47.  Finally, while the ALJ cites numerous records to support his determination that "the claimant otherwise presented with generally unremarkable findings," he does not identify the dates of these findings.  PageID.44.

In summary, it is unclear from the ALJ's decision as to the extent of plaintiff's symptoms and limitations during the relevant time period, *i.e.*, from her amended disability onset date (July 1, 2019) through the date of the decision (November 19, 2020).  An ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning."  *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).  Here, the Court cannot trace the ALJ's reasoning with respect to plaintiff's symptoms and limitations during the relevant time period.  Accordingly, this matter will be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the Commissioner is directed to re-evaluate plaintiff's symptoms and limitations during the relevant time period.

### IV.    CONCLUSION

For these reasons, the Commissioner's decision will be **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the Commissioner is directed to re-evaluate (1) plaintiff's symptoms taking into account her inability to afford medical treatment during the time in which she did not have medical insurance, and (2) plaintiff's symptoms and limitations during the relevant time period of July 1, 2019, through November 19, 2020. A judgment consistent with this opinion will be issued forthwith.


Dated:  September 21, 2023                    /s/ Ray Kent
                                              RAY KENT
                                              United States Magistrate Judge